# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                   No. CR 07-390 MCA

**VICTOR IVAN DIAZ-MORENO**,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Victor Ivan Diaz-Moreno's

*Motion to Suppress* [Doc. 26] filed on May 3, 2007, and *Motion for Production of Dog and*

*Handler's Training and Field Records* [Doc. 16] filed on March 26, 2007.  The Court held

an evidentiary hearing on these motions on June 15, 2007.  Having considered the parties'

submissions, the applicable law, the evidence and the arguments of counsel presented at the

hearings, and being fully advised in the premises, the Court denies Defendant's motions

based upon the findings of fact and conclusions of law set forth below.

## I.    FINDINGS OF FACT

### A.    The Initial Inspection at the Border Patrol Checkpoint

1.    On the morning of November 29, 2006, United States Border Patrol agents

Raymond Torres, Jimmy Ross, and Frank Rodriguez were on duty at or near the permanent

Border Patrol checkpoint located on Highway 54 south of Alamogordo, New Mexico, when the events described below occurred.

2.      Agent Torres was stationed at the checkpoint's primary inspection area at approximately 11:40 a.m., when he observed a Chevrolet pickup truck with two occupants driving northbound into the checkpoint.

3.      The Defendant in this case, Victor Ivan Diaz-Moreno, was later identified as the passenger in that vehicle.

4.      The vehicle's driver was later identified as Jose Alfredo Gamboa, and he is not charged with any crime in this case.

5.      In response to Agent Torres' initial questioning at the checkpoint's primary inspection area, Mr. Gamboa identified himself and stated that he was a United States citizen.

6.      After Mr. Gamboa spoke, Defendant identified himself by presenting the agent with a border-crossing card and an I-94 form bearing his name.

7.      Border crossing cards and I-94 forms are not issued to United States citizens, and thus Defendant's display of these documents indicated to the Border Patrol agents that he was a citizen of Mexico.

8.      Agent Torres next asked Mr. Gamboa about his travel plans and ownership of the pickup truck.

9.      Mr. Gamboa responded that he was traveling to Greeley, Colorado, and that he had purchased the pickup truck a week earlier in Colorado but it was not registered under his name.

10.    During this initial questioning, Agent Torres noticed that neither Mr. Gamboa nor Defendant would make eye contact with him.

11.    Based on the information obtained during his initial questioning at the primary inspection area, Agent Torres asked Mr. Gamboa if he would permit the Border Patrol agents to search the pickup truck using a canine, and Mr. Gamboa consented to this request without qualification.

12.    Defendant did not state any disagreement with Mr. Gamboa's consent to the agents' search of the pickup truck.

13.    Upon receiving Mr. Gamboa's consent, Agent Torres referred the pickup truck to the checkpoint's secondary inspection area, where Mr. Gamboa parked the vehicle.

14.    After parking in the secondary inspection area, Mr. Gamboa and Defendant opened the doors to the pickup truck, exited the vehicle, and took a seat on a bench a short distance away.

15.    Meanwhile, Agent Torres summoned Agent Ross to the secondary inspection area and informed him that Mr. Gamboa had consented to the search of the pickup truck with a canine.

**B.    The Training and Certification Process for
the Border Patrol Canine and Handler Team**

16.    Agent Ross has been employed with the United States Border Patrol for the past nine years and has been employed as a canine handler for the past five years.

17.     Agent Ross and his dog, Henkie, have been working as a dog and handler team during this entire five-year period.

18.     Following their completion of a training course, the Border Patrol's National Canine Facility originally certified Agent Ross and Canine Henkie in the detection of concealed humans and the odors of cocaine, marijuana, heroin, methamphetamine, and their derivatives on June 12, 2002.

19.     Since that date, Agent Ross and Canine Henkie have been recertified by the Border Patrol's National Canine Facility on an annual basis.

20.     The National Canine Facility's recertification of Agent Ross and Canine Henkie was valid and in effect before, during, and after the performance of their duties at the Border Patrol checkpoint on November 29, 2006.

21.     The National Canine Facility's original certification process, as well as its annual recertification process, require a dog and handler team to perform 14 searches with 15 finds in a variety of controlled environments and receive a score for each search.

22.     Upon completion of the annual certification process, a team's scores are reported in a certification letter.  [Ex. 1.]

23.     In this case, the recertification letter in effect for the period including November 29, 2006, shows that Agent Ross and Canine Henkie successfully completed the National Canine Facility's training and testing on May 19, 2006, with a total certification score of 3.02, which is in the average range for teams that pass the certification tests.

24.     In addition to this annual recertification process, Agent Ross and Canine Henkie have completed at least 16 hours of training per month with a Border Patrol instructor; typically, the dog and handler attend one eight-hour training session every two weeks.

25.     Many of the details of the Border Patrol's training regimen and the National Canine Facility's certification process are reported in published opinions and transcripts that were available to counsel before the hearing in this matter.  See, e.g., United States v. Morales, ___ F. Supp. 2d ___, 2007 WL 1560332, at *1-4 (D.N.M. 2007); United States v. Sanchez, No. CR 07-117 MCA (D.N.M. transcripts filed Apr. 10, 2007).

26.     In addition, counsel were given the opportunity to elicit testimony about canine training and certification from Agent Ross as well as the Border Patrol's Canine Coordinator for the El Paso Sector, Alonzo Rodriguez, at the hearing on June 15, 2007.

27.     Agent Alonzo Rodriguez credibly testified, however, that there is a legitimate law-enforcement need to limit the disclosure of certain details of the Border Patrol's canine training and certification process, because if those engaged in smuggling controlled substances and undocumented persons had complete access to the training and certification process in its entirety, then they could use such access to develop smuggling techniques aimed at evading detection by Border Patrol canines.

28.     According to the witness' testimony in this case and the public record in other reported cases, the Border Patrol uses the following terminology to distinguish an "alert" from an "indication" and to further distinguish a "false alert" from a "nonproductive alert":

a.      An "alert" is defined as a change in body posture and an increase in respiration when a dog first encounters an odor it has been trained to detect;

b.      An "indication" is defined as trained behavior by the dog that pinpoints the source of odor; however, the source of the odor from the dog's perspective may not correspond exactly to the location of the substance from which it emanates, because the dog may not be able to reach that location due to physical barriers, or because the odor may travel to, or pool in, a different location depending on air currents or the configuration of the area being searched;

c.      A "false alert" occurs when a handler operating in a controlled environment interprets his or her dog's behavior as an alert or indication, but no controlled substances or concealed humans are ultimately found, and it has been previously established that no trained odors are present;

d.      A "nonproductive alert" occurs when a handler operating in an uncontrolled field environment (such as a checkpoint) interprets his or her dog's behavior as an alert or indication, but no tangible source of a trained odor is ultimately found.

29.     In this case, Agent Ross testified that he and Canine Henkie have never had a "false alert" in a controlled environment.

30.     Agent Ross also testified that he has experienced a few nonproductive alerts while working with Canine Henkie in uncontrolled environments in the field during the past five years, but he was unable to quantify the number of nonproductive alerts during this period because the Border Patrol does not keep records of such nonproductive alerts.

31.     A nonproductive alert does not necessarily imply that no trained odor is present, because a residual odor of a controlled substance may persist on clothing or upholstery in the same manner as cigarette smoke, or the agents may have simply failed to locate a tangible source of the odor because of restraints on the time and resources that are available for performing a thorough search.

32.     In most instances, there are too many variables to determine the significance of a nonproductive alert because, by definition, nonproductive alerts occur in uncontrolled environments.

33.     Nevertheless, the Border Patrol's regular training sessions provide an opportunity to monitor, report, and evaluate the dog and handler's performance in the field, including any unexplained or unusually frequent nonproductive alerts.

34.     The parties have not elicited any credible testimony or other evidence calling into question the validity or reliability of the Border Patrol's training and certification process as it pertains to Agent Ross and Canine Henkie on November 29, 2006, and I find that training and certification process to be reliable.

C.     **The Canine Inspection of the Pickup Truck**

35.     At the request of Agent Torres and with Mr. Gamboa's consent, Agent Ross and Canine Henkie performed a canine inspection of the pickup truck at the checkpoint's secondary inspection area on the morning of November 29, 2006.

36.     At the time of this canine inspection, Defendant and Mr. Gamboa had exited the pickup truck, and the vehicle was parked in the secondary inspection area with both front doors of the passenger compartment left open.

37.     Agent Ross began the canine inspection by running Canine Henkie around the exterior of the pickup truck; while doing so, Agent Ross observed that Canine Henkie began to alert (as exhibited by increased respiration and changes in body posture).

38.     While exhibiting his alerting behavior, Canine Henkie jumped into the pickup truck's passenger compartment through one of the open front doors and indicated by pointing to the center console area inside the passenger compartment.

39.     Agent Ross did not place or push Canine Henkie into the pickup truck's passenger compartment; rather, Canine Henkie entered the vehicle through an open door on his own initiative and in accordance with the dog's trained behavior of trying to pinpoint the source of the odor to which he was alerting.

40.     At the hearing on June 15, 2007, counsel were given the opportunity to call and elicit testimony from the persons who were present during the canine inspection at the checkpoint's secondary inspection area on November 29, 2006.

41.     Despite this opportunity, the parties have not elicited any credible testimony or other evidence calling into question the validity or reliability of Canine Henkie's alert or indication during the canine inspection of the pickup truck performed with Agent Ross at the checkpoint's secondary inspection area on November 29, 2006.

42.     In particular, there is no credible evidence that the dog and handler failed to perform in accordance with their training on this occasion or that the dog or handler's performance was adversely affected by any health problems or obvious sources of cross contamination in the checkpoint area at the time of the alert or indication.

43.     Based on the totality of the circumstances, Canine Henkie's alert and indication established probable cause to search the pickup truck and its contents for the sources of the odors the dog is trained to detect (*i.e.*, concealed humans, cocaine, marijuana, heroin, methamphetamine, and their derivatives), and to detain Defendant pending the results of that search.

### D.      The Search of Defendant's Duffle Bag

44.     After Canine Henkie indicated to the center console area inside the pickup truck's passenger compartment, Agent Ross retrieved the dog from the pickup truck and returned him to a holding area in the back of a Border Patrol vehicle.

45.     At about the time Agent Ross was returning Canine Henkie to the holding area, Agent Frank Rodriguez arrived at the checkpoint and learned from other agents that an investigation was underway because the dog had alerted to the pickup truck in which Defendant and Mr. Gamboa were traveling.

46.     Agent Frank Rodriguez then returned to the pickup truck with Agent Ross in order to search the vehicle and its contents for controlled substances or concealed humans.

47.     While Agent Ross began to search the pickup truck's passenger compartment, Agent Frank Rodriguez went to speak with Defendant and Mr. Gamboa.

48.     During their brief conversation with Agent Frank Rodriguez, Mr. Gamboa identified himself by displaying his driver's license, and Defendant again displayed his border crossing card and I-94 form indicating that he was a citizen of Mexico.

49.     After reviewing these documents, Agent Frank Rodriguez went back to the pickup truck's passenger compartment, lifted up a small duffle bag that he saw behind the driver's seat, and asked Defendant and Mr. Gamboa "whose bag this was."

50.     Defendant responded that the small duffle bag was his, whereupon Agent Frank Rodriguez asked for and obtained Defendant's consent to search that particular bag before opening it.

51.     Upon opening the small duffle bag, Agent Frank Rodriguez immediately observed that the bag contained some documents in plain view that laid "right on top" of the bag's contents, with clothing underneath them.

52.     From Agent Frank Rodriguez's perspective looking into the bag immediately after he opened it, the documents lying on top of the clothing appeared to be a driver's license, a Social Security card, and a folded piece of paper that, based on the agent's training and experience, looked like a birth certificate.

53.     The folded document matching the appearance of a birth certificate was a "red flag" to Agent Frank Rodriguez because, based on his training and experience, birth certificates are typically used to prove United States citizenship, and thus a birth certificate indicating United States citizenship would be inconsistent with the border crossing card and I-94 form previously displayed by Defendant, which indicated Mexican citizenship.

54.     Before completing his search of the remainder of the small duffle bag, Agent Frank Rodriguez unfolded the document in question and confirmed that it purported to be a birth certificate issued in the United States for an individual in Defendant's age group but with a different name.

55.      In response to further questioning by Agent Frank Rodriguez, Defendant stated that the birth certificate found in the small duffle bag was not his, but he gave no explanation for why it was in his possession.

56.     Based on the suspicions about Defendant's identity that were raised by the inconsistency between the birth certificate found in his duffle bag and the documents evincing Mexican citizenship that he had previously displayed to the Border Patrol agents, Agent Frank Rodriguez took Defendant's fingerprints and ran a records check to determine his true identity.

57.     This fingerprinting and records check revealed evidence that Defendant had reentered the United States unlawfully after having previously been deported; he was therefore kept in custody and placed under arrest.

58.     From start to finish, the Border Patrol agents' detention of Defendant, the search of his duffle bag, and the ensuing records check did not violate the Fourth Amendment; thus, the detention and search have no causal connection to any Fourth Amendment violation and provide no basis for invoking the exclusionary rule in this case.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.    Defendant's Discovery Motion

In order to further explore the reliability of the canine inspection discussed above, Defendant has filed a discovery motion requesting that the Government be ordered to disclose the following categories of information:

> a. All records and documents generated during the training and field activity of Agent Ross' canine partner "Henkie" including:
>
> 1. The dog's training history, including his initial training and any subsequent recertifications;
>
> 2. The training, education, and certifications of his handler, Agent Ross.
>
> 3. The training manual issued to handler Ross and any written materials received by handler Ross at recertifications;
>
> 4. "Henkie's" veterinary history; and
>
> 5. All recorded history of "Henkie's" activities, including field and training logs, incident reports, including but not limited to, false alerts or alerts or alerts where no contraband was subsequently located or seized.

[Doc. 34, at 4-5.]  The Court takes judicial notice that the same or very similar categories of documents are now being routinely requested in criminal cases in this district when a canine inspection is at issue.  See, e.g., United States v. Sanchez, No. CR 07-117 MCA (D.N.M. filed Feb. 26, 2007); United States v. Morales, No. CR 06-2607 MCA, Doc. 17 (D.N.M. filed Jan. 24, 2007); United States v. Forbes, No. CR 06-1578 RB, Doc. 20 (D.N.M. filed Jan. 8, 2007); United States v. Polston, No. CR 04-1850 JCH, Doc. 29 (D.N.M. filed Dec. 2, 2004).

The rationale for rejecting these requests has been well-stated in other cases.  See, e.g., United States v. Kennedy, 131 F.3d 1371, 1378 (10th Cir. 1997); United States v. Gonzalez-Acosta, 989 F.2d 384, 389 (10th Cir. 1993); Morales, ___ F. Supp. 2d ____, 2007 WL 1560332, at *7-11; Forbes, No. CR 06-1578 RB, supra, Doc. 39.  I therefore take judicial notice of the record in other recent cases in this district where the same type of motion was denied.  See Green v. Nottingham, 90 F.3d 415, 418 (10th Cir. 1996) (federal courts may take notice of judicial proceedings in other courts if they have a direct relation to matters at issue).

In several of these recent cases, a representative of the National Canine Facility has testified in great detail as to the rigorous standards to be met and the detailed scoring system to be applied before a dog and its handler will be certified or recertified through that agency's program.  See, e.g., Sanchez, No. CR 07-117 MCA (transcript of proceedings held on Mar. 28, 2007); Morales, No. CR 06-2607 MCA (transcript of proceedings held on Mar. 1, 2007).  Reported opinions and transcripts containing this extensive testimony were available to counsel prior to the hearing on June 15, 2007, and could have answered several of counsel's questions concerning the meaning of the scores reported on the certification documents.

According to the agents' testimony at the hearing on that date and the certification documents presented in the case at bar, Agent Ross and Canine Henkie successfully completed the National Canine Facility's training and certification process, and in their annual recertification on May 19, 2006, they obtained an average certification score.  Officer Ross also discussed his history with the dog, including the subject of false alerts and

nonproductive alerts.  For the reasons explained in more detail in the analysis of Defendant's motion to suppress, the officer's testimony on this subject did not reveal any problems at the time of the canine inspection at issue here.  The Border Patrol's Canine Coordinator for the El Paso Sector, Alonzo Rodriguez, provided additional testimony about the dog and handler's participation in the National Canine Facility's training and certification program.

For the purpose of establishing probable cause for a search and seizure during Agent Ross's field operations at the Border Patrol checkpoint, the testimony outlined above, together with a review of the certification documents for the dog and handler team, are sufficient to determine the reliability of the canine inspection.  Through such testimony and review of the documents already produced to him, Defendant was provided with a fair opportunity to make a threshold showing, for purposes of a discovery motion, that the dog and handler were not certified at the time of the canine inspection at issue, or that there is a specific reason to question the validity or reliability of the certification.  See Gonzalez-Acosta, 989 F.2d at 389.  When, as here, neither the witnesses' testimony nor the existing documents establish such a threshold showing, no legitimate purpose is served by requiring the Government to produce additional supporting documentation (through a discovery order or additional hearing) in response to a blanket request for all records relating in any way to the training or past performance of a dog and its handler.  Therefore, Defendant's discovery motion is denied.

**B.**   <u>**Defendants' Fourth Amendment Standing**</u>

In response to Defendant's suppression motion, the Government specifically challenges Defendant's Fourth Amendment standing[1] to challenge the search of the pickup truck and duffle bag.  Accordingly, it is necessary to begin the Court's analysis of Defendant's motion to suppress by examining whether or to what extent Defendant has shown a reasonable expectation of privacy in the areas or items which the Border Patrol agents searched or seized during their investigation at the checkpoint.

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u>, <u>California v. Acevedo</u>, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).

--------------------------------------------------------

[1]The Court uses the term "standing" as a convenient shorthand for referring to a defendant's reasonable expectation of privacy in the item or area that is the subject of the search or seizure he is challenging.  Although commonly used in this sense in many reported opinions, the common usage of the term "standing" in this context is technically incorrect because the matter is decided on the basis of substantive Fourth Amendment law rather than the jurisdictional requirements of Article III.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 139-40 (1978).  Thus, as a technical matter, the longer phrase,  "reasonable expectation of privacy," can be substituted for the term "standing" wherever it appears in this *Memorandum Opinion and Order.*

The Supreme Court has recently clarified that this principle applies to an automobile's passengers as well as its driver.  See Brendlin v. California, ___ S. Ct. ___, No. 06-8120, 2007 WL 1730143, at *2 (S. Ct. June 18, 2007).  In this instance, there is no question that the initial stop at the Border Patrol checkpoint was directed at determining the citizenship or immigration status of both of the vehicle's occupants.  It follows that Defendant was seized within the meaning of the Fourth Amendment when the pickup truck was detained at the Border Patrol checkpoint.  See id.  Defendant has standing to challenge the seizure of his person during the Border Patrol checkpoint stop, regardless of whether he has a reasonable expectation of privacy in the pickup truck itself.  See United States v. Olivares-Rangel, 458 F.3d 1104, 1112 (10th Cir. 2006); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).

Defendant does not have Fourth Amendment standing, however, to directly challenge the search, seizure, or questioning of any other individual who was detained by the Border Patrol agents, because "[i]t is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights." United States v. Arango, 912 F.2d 441, 445 (10th Cir.1990); accord United States v. Rascon, 922 F.2d 584, 586 (10th Cir. 1990).  "'[A] defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." United States v. DeLuca, 269 F.3d 1128, 1131 (10th Cir. 2001) (quoting United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).

-16-

It follows that a challenge to the search of the pickup truck or the duffle bag requires Defendant to first show that he has an interest in those items that is protected by the Fourth Amendment.  See United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990); Rascon, 922 F.2d at 587.  The existence of a cognizable Fourth Amendment right to be free from unreasonable searches and seizures of a motor vehicle or the luggage contained therein depends on two factors:  whether the individual in question has exhibited a subjective expectation of privacy in the vehicle or luggage, and whether society recognizes that subjective expectation as reasonable.  See Rascon, 922 F.2d at 586.  Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession of a motor vehicle, mere possession or control of the vehicle alone is not sufficient to satisfy this test.  See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

In this case, Defendant has not met his burden of showing a reasonable expectation of privacy with respect to the pickup truck driven by Mr. Gamboa.  At the hearing on June 15, 2007, Defendant presented no testimony or other evidence which could support a reasonable inference that he had any interest in the pickup truck that is protected by the Fourth Amendment.  Rather, the testimony at the hearing indicates that Mr. Gamboa owned and controlled the pickup truck, and that Defendant was merely a short-term passenger with no ownership or possessory interest in the vehicle itself.

It follows that Defendant does not have Fourth Amendment standing to challenge the search or seizure of the pickup truck.  In particular, Defendant lacks any basis on which to

challenge the validity or scope of Mr. Gamboa's consent to search.  Thus, it is immaterial whether the Border Patrol agents or Mr. Gamboa opened the doors to the pickup truck to facilitate the search, or whether the scope of Mr. Gamboa's consent included the interior of the vehicle's passenger compartment.  In either case, Defendant lacks a reasonable expectation of privacy in the pickup truck on which to base a Fourth Amendment challenge.

I reach a different conclusion with respect to the small duffle bag containing the birth certificate that Agent Frank Rodriguez opened and searched during the checkpoint stop.  In response to the agent's questioning about the duffle bag, Defendant stated that it belonged to him.  Mr. Gamboa also testified that this bag (which he alternatively described as a small backpack or gym bag) belonged to Defendant and that Defendant had brought it with him from Mexico.  It is apparent from this testimony that the bag was zipped shut, or otherwise closed to conceal its contents from public view, before the agent's search.  In light of this testimony and the authorities cited below, I find that Defendant has a reasonable expectation of privacy in the small duffle bag's contents.

In a similar context, the Tenth Circuit concluded that a passenger in a rental vehicle had Fourth Amendment standing to challenge the search of his personal luggage consisting of closed bags stored in the vehicle's trunk even though he did not have standing to challenge the search of the vehicle itself.  See United States v. Edwards, 242 F.3d 928, 936-37 (10th Cir. 2001); United States v. Benitez-Arreguin, 973 F.2d 823, 827-28 (10th Cir.1992) (similar).  Other courts recognize that "an ownership or possessory interest in seized goods, while not dispositive, is relevant to determining whether an accused has a reasonable

expectation of privacy." United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992).

Further, "[a] traveler's personal luggage is clearly an 'effect' protected by the [Fourth]

Amendment." Bond v. United States, 529 U.S. 334, 336 (2000). Therefore, Defendant has

Fourth Amendment standing to challenge the search of his duffle bag, as well as the

detention of his person.

### C.    The Initial Detention at the Secondary Inspection Area

Because the seizure of Defendant's person and the search of his duffle bag were

effected without a warrant, the burden shifts to the Government to show that this search and

seizure were reasonable, i.e., that they fit under one or more of the recognized exceptions to

the Fourth Amendment's warrant requirement. See United States v. Maestas, 2 F.3d 1485,

1491 (10th Cir. 1993). The Government easily meets this burden with respect to Defendant's

initial detention at the Border Patrol checkpoint.

Where, as here, the detention occurs at a fixed checkpoint (rather than during a roving

patrol) "border patrol agents may stop, briefly detain, and question individuals without any

individualized suspicion that the individuals are engaged in criminal activity." United States

v. Massie, 65 F.3d 843, 847 (10th Cir. 1995). A "routine checkpoint stop," which must be

brief and unintrusive, generally involves questions concerning the motorist's citizenship or

immigration status, and a request for documentation. A cursory visual inspection of the

vehicle is also routine, and a few brief questions concerning such things as vehicle

ownership, cargo, destination, and travel plans may be appropriate if reasonably related to

the agent's duty to prevent the unauthorized entry of individuals into this country and to

-19-

prevent the smuggling of contraband.  See United States v. Rascon-Ortiz, 994 F.2d 749, 752 (10th Cir. 1993).  So long as the overall scope and duration of a routine checkpoint stop is not exceeded, it does not matter whether the stop occurs in the portion of the roadway designated as the checkpoint's primary inspection area or in an adjoining parking space designated as a secondary inspection area.  See United States v. Sanders, 937 F.2d 1495, 1499-1500 (10th Cir. 1991) (citing United States v. Martinez-Fuerte, 428 U.S. 543, 563 (1976)); Rascon-Ortiz, 994 F.2d at 753.

During such a routine checkpoint stop, a Border Patrol agent who observes "suspicious circumstances" may briefly question a motorist concerning those suspicions and ask the motorist to explain, since "[t]he Fourth Amendment does not require police officers to close their eyes to suspicious circumstances."  Sanders, 937 F.2d at 1500.  "While there is no single definition of what constitutes a 'suspicious circumstance,' border patrol agents are given deference in relying upon their law enforcement training and past experience in deciding whether a suspicious circumstance exists."  Rascon-Ortiz, 994 F.2d at 753.  "Suspicious circumstance" is not synonymous with "reasonable suspicion."  Instead, the presence of a suspicious circumstance allows a border patrol agent to ask a few additional questions concerning the suspicion during the course of a routine immigration inspection.  Since the additional questions do not add significantly to the length or intrusiveness of the detention, the more rigid Fourth Amendment requirements of probable cause or reasonable suspicion do not apply.  Id. n.6.

In this case, Agent Torres' initial questions about citizenship or immigration status, as well as his brief inquiry about the ownership or registration of the pickup truck, fell within the permissible boundaries of a routine checkpoint stop. The failure on the part of the pickup truck's occupants to make eye contact with Agent Torres, combined with Mr. Gamboa's statements that had just purchased the pickup truck a week earlier in Colorado and that the pickup truck was not registered under his name, provided a "suspicious circumstance" that warranted prolonging the checkpoint stop for a brief period in order to elicit further explanation.

During the permissible scope and duration of the checkpoint stop, Agent Torres requested and received Mr. Gamboa's consent to perform a canine inspection of the pickup truck. At that point, it was Mr. Gamboa's consent, rather than any unconstitutional conduct on the part of the agents, which made the search of the pickup truck more intrusive and caused Defendant to remain at the checkpoint while the canine inspection of the pickup truck occurred. As noted above, Defendant has articulated no basis upon which he has Fourth Amendment standing to challenge Mr. Gamboa's consent to the canine inspection, nor has he exhibited any reasonable expectation of privacy in the truck itself.

While Mr. Gamboa's consent may have extended the scope and intrusiveness of the agent's *search of the pickup truck* beyond that of a routine checkpoint stop, the canine inspection alone did not appreciably lengthen the *duration of Defendant's detention* beyond the permissible boundaries of a routine checkpoint stop premised on "suspicious circumstances." And once the dog alerted and indicated to the pickup truck's center console

area, it was no longer necessary for the agents' search and seizure to find its justification in Mr. Gamboa's consent or in the parameters of a routine checkpoint stop.  It follows that Defendant has identified no illegality in the agent's brief detention of his person at the checkpoint that preceded the dog's alert and the discovery of the duffle bag's contents.

###### D.     The Canine Inspection

The canine inspection of a vehicle's exterior surfaces that precedes an alert is not itself a "search" within the meaning of the Fourth Amendment, because there is no reasonable expectation of privacy in the odors of controlled substances emanating from the vehicle into the public space around it.  See United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993).  In this case, Defendant also has not demonstrated any reasonable expectation of privacy in the pickup truck that would enable him to challenge the opening of its doors or the dog's entry into the passenger compartment during the canine inspection.  In any event, the dog's alerting behavior began *before* it entered the passenger compartment, and it is not at all clear that the agents were the ones who opened the doors to the passenger compartment prior to or during the canine inspection.  Under these circumstances, the dog's entry into the passenger compartment was part of his instinctive behavior in seeking out the source of the odor to which he had alerted, rather than a pretextual or strategic maneuver designed by the agents to facilitate a more intrusive search.  See Morales, ___ F. Supp. 2d at ___, 2007 WL 1560332, at *13-14 (citing United States v. Stone, 866 F.2d 359, 363-64 (10th Cir. 1989)).

Once the dog alerted or indicated to the pickup truck's center console area, however, the continuation of Defendant's detention beyond that point, as well as the ensuing search

of the duffle bag, require further justification under the Fourth Amendment.  To establish the reasonableness of the duffle-bag search, the Government relies in part on the "automobile exception" to the Fourth Amendment's warrant requirement, see Chambers v. Maroney, 399 U.S. 42, 51-52 (1970), and the general rule that once a dog reliably alerts to the presence of controlled substances, border patrol agents have probable cause to search an automobile and its contents for those substances, see United States v. Pinedo-Montoya, 966 F.2d 591, 594 (10th Cir. 1992); United States v. Morales-Zamora, 914 F.2d 200, 205 (10th Cir. 1990).

Under the "automobile exception," probable cause alone can provide a basis to search a vehicle's interior and contents for as long as the vehicle lawfully remains in police custody; there is no need for a showing of exigent circumstances.  See generally Florida v. Myers, 466 U.S. 380, 382 (1984).  The probable cause which provides the justification for the search also establishes the justification for continuing to detain Defendant, at least until the search is promptly completed and its results become known to the agents.  See, e.g., United States v. Bell, 892 F.2d 959, 968 (10th Cir. 1989).

Courts have held that the term "probable cause" is not self-defining, but requires an inquiry based upon common sense informed by the totality of the circumstances found in the particular case.  See United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004) (citing Illinois v. Gates, 462 U.S. 213 (1983)).  In determining whether probable cause exists, a judge's task

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the [record] . . . before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is

a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting Gates, 462 U.S. at 238).

In the context of dog alerts or canine inspections, this practical, common-sense decision has been distilled into a general rule that derives from

the fact that the dog is trained and annually certified to perform a physical skill. When the annual certification process involves actual field testing and grading of the canine's drug-detection skills, the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine's skill and performance.

Kennedy, 131 F.3d at 1378 (quoting United States v. Wood, 915 F. Supp. 1126, 1136 n.2 (D. Kan. 1996), rev'd on other grounds, 106 F.3d 942 (10th Cir. 1997)); accord Morales, __ F. Supp. 2d at ___; 2007 WL 1560322, at *8.

While it must be acknowledged that Canine Henkie's alert and indication to the center console area was nonproductive because it did not lead to the agents' discovery of any concealed humans or any tangible quantity of controlled substances, this fact alone does not render the dog's behavior unreliable for purposes of establishing probable cause.  The Tenth Circuit has noted that a nonproductive "alert does not mean necessarily that the dog alerted without detecting any odor of narcotics.  Dogs are capable of detecting narcotics residue that may appear on money or clothing that has come in contact with drugs, even though no seizable quantity has been found."  Kennedy, 131 F.3d at 1375 n.6.  In addition, several other courts have found a certified drug-detection dog's alert to be reliable enough to establish

probable cause even when the search that followed did not turn up any tangible quantity of the substances that the dog is certified to detect.  See United States v. Outlaw, 319 F.3d 701, 704 (5th  Cir. 2003) (collecting cases where an alert by a certified dog was found to be reliable even though the ensuing search revealed a type of contraband that the dog was not trained to detect); United States v. King, 12 Fed. Appx. 737, at *4 (10th Cir. 2001) (unpublished disposition); United States v. Koon Chung Wu, No. 06-4172, 2007 WL 412169, at *5-6 (4th Cir. Feb. 2, 2007) (unpublished disposition); United States v. Bertram, No. CR-07-10-JHP, 2007 WL 1375576, at *6 (E.D. Okla. May 3, 2007); cf. United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00), 403 F.3d 448, 460-65 (7th Cir. 2005) (concluding that dog alert was reliable for purposes of detecting residual odor of cocaine on seized currency and rejecting various theories of cross-contamination); United States v. Limares, 269 F.3d 794, 797-98 (7th Cir. 2001) (similar).

In this case, counsel were given a fair opportunity to question Agent Ross, as well as the Border Patrol's Canine Coordinator for the El Paso Sector, regarding the presence of any unusual circumstances that might bear on the reliability or credibility of Canine Henkie's alerting behavior during the canine inspection at issue here.  Had counsel taken advantage of the opportunity to research the issue, they also would have had available the reported opinions and transcripts from other recent cases in which the reliability of a canine inspection has been challenged.  See, e.g., Morales, ___ F. Supp. 2d at ___, 2007 WL 1560332, at *1-4; United States v. Sanchez, No. CR 07-117 MCA (D.N.M. transcripts filed Apr. 10, 2007).

In this case, the agents' testimony at the hearing on June 15, 2007, indicated that for the past five years, the dog and handler have been trained and certified according to the rigorous standards of the Border Patrol's National Canine Facility, which the Court previously recognized as reliable after hearing extensive testimony in Morales, ___ F. Supp. 2d at ___, 2007 WL 1560332, at *8. With regard to the canine inspection of Mr. Gamboa's pickup truck on November 29, 2006, there was no credible testimony that the dog and handler failed to perform in accordance with their training, or that Canine Henkie suffered from any health problems impacting his sense of smell, or that there was any obvious source of cross-contamination at the checkpoint which could have confused the dog and caused it to alert to the wrong vehicle.

Under these circumstances, the fact that the dog's alert and indication was nonproductive in this instance, or that the dog has had a few other nonproductive alerts during its five years of service with Agent Ross, does not persuade me that the behavior of the dog or handler was unreliable for purposes of establishing probable cause in this case. As Agent Ross discussed in his testimony, occasional nonproductive alerts in an uncontrolled environment have limited significance for purposes of determining a dog and handler's reliability because there are usually too many variables which may affect the dog's behavior in that context. Agent Ross noted, for example, that in most instances where Canine Henkie has a nonproductive alert, subsequent questioning revealed that the item to which the dog alerted recently came into contact with a controlled substance, as when an individual smokes

marijuana or cocaine in a vehicle and the smoke leaves a residual odor on the vehicle's upholstery for some period of time after the illegal activity occurred.

Rather than pointing to any specific circumstances that rendered the dog or handler's trained behavior unreliable in this instance, Defendant's counsel only raises a more generalized suspicion that Border Patrol agents are using dogs in a pretextual manner by claiming–without any objective supporting evidence--that the dogs are alerting whenever their handlers feel like searching a vehicle or other item for drugs or concealed humans. This suspicion is unfounded. The Border Patrol has little incentive to use the unsupported hunches of its agents, rather than a dog's objectively reliable alerting behavior, as a criterion for deciding which vehicles or other items to search at a checkpoint stop. The former practice would amount to an inefficient and ineffective use of the agents' time, as it would result in many searches that have very little probability of turning up evidence of the immigration offenses or other crimes the Border Patrol is charged with detecting at its checkpoints. Such unproductive searches, in turn, increase the prospects that the Border Patrol or its agents will be hauled into court and charged with violating the civil rights of innocent citizens. Especially in the context of checkpoint stops where the Border Patrol faces a very large volume of vehicles and persons to inspect, the more reasonable inference to be drawn from the law and the evidence is that the Border Patrol has every incentive to use its canine and handler teams in the most reliable manner possible, so that the agency's resources are targeted precisely at those persons or places most likely to be concealing

evidence of criminal activity, and the risk of liability associated with ensnaring innocent citizens in prolonged and intrusive searches is kept to a minimum.

For all of the above reasons, I determine that Canine Henkie's alert to Mr. Gamboa's pickup truck and indication to the truck's center console area provided probable cause to search the pickup truck and its contents for concealed humans and the four controlled substances that the dog is trained to detect.  The Border Patrol agents also had probable cause to continue detaining Defendant while they completed this search of the pickup truck and its contents.

### E.       Search of the Duffle Bag and Birth Certificate

I next address whether the permissible scope of the Border Patrol agents' search extended to the birth certificate and other false identification documents located in the small duffle bag that Defendant stored behind the driver's seat in the pickup truck's passenger compartment.  The general rule is that when "probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents *that may conceal the object of the search*."   See United States v. Ross, 456 U.S. 798, 825 (1982) (emphasis added).  The rationale behind this rule is that:  "The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted.  Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found."  Id. at 824.

The Tenth Circuit has held that a reliable dog alert can provide probable cause to search an entire vehicle and its contents for narcotics, not just the immediate location where

the dog indicated.  See United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).  Because the dog alert was reliable in this case, the Fourth Amendment therefore permitted the agents to search the duffle bag for narcotics even if it was located in a portion of the vehicle's passenger compartment other than the center console where the dog indicated.  Under the Ross rationale, the duffle bag was a part of the vehicle's contents that could conceal the object of the search.

The next question is whether, in the course of searching the duffle bag, it was reasonable for the officers to read the text or images on the birth certificate or other false identification documents concealed therein.  The only objects of this search for which the agents established probable cause through the dog alert were concealed humans and the four controlled substances the dog is certified to detect.  Obviously, the written text or photographic images appearing on a card or document do not serve to conceal humans or controlled substances hidden within a duffle bag, so the agents' reading of such cards or documents during the search of the duffle bag does not come within the permissible scope of the search under the rationale articulated in Ross.

It is possible, however, that an incriminating text or image appearing on a document may come into an agent's plain view while searching a duffle bag for controlled substances. Courts "have upheld the plain view seizure of documents even when the police only learned of the documents' incriminating nature by perusing them during a lawful search for other objects." United States v. Soussi, 29 F.3d 565, 570 (10th Cir. 1994); see, e.g., United States v. Gentry, 642 F.2d 385, 387 (10th Cir.1981) (upholding plain view seizure of documents

relating to the manufacture of methamphetamine sulfate in the course of a lawful search for drugs); United States v. Barnes, 909 F.2d 1059, 1070 (7th Cir.1990) (given the immediately apparent incriminating nature of the contents of a spiral notebook found in plain view, the officers were justified in seizing it during the execution of a warrant to seize cocaine because the cocaine could have been stored in the notebook).  But see United States v. Wick, 52 F. Supp. 2d 1310, 1322-27 (D.N.M. 1999) (concluding that certain documents found during the execution of a search warrant for ammunition or ammunition components did not fall under the plain view doctrine).

In order "to prevent the plain view doctrine from eviscerating Fourth Amendment protections," courts have required the Government to satisfy a three-part test in order to establish the reasonableness of such document searches.  Soussi, 29 F.3d at 570.  Under this test, the Government must show that:  "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent-i.e. the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself." Id. (citing Horton v. California, 496 U.S. 128, 136-37 (1990), and United States v. Dixon, 1 F.3d 1080, 1084 (10th Cir.1993)).

In this case, Agent Frank Rodriguez was lawfully in a position from which to view the duffle bag's contents because the dog alert was reliable enough to establish probable cause to search that bag for the controlled substances that Canine Henkie is trained to detect. For the following reasons, I also find that the incriminating nature of the text or images on

the birth certificate found in the duffle bag was immediately apparent to the agent when they came into plain view during the permissible scope of the search for controlled substances.

First, the existence of the papers in Defendant's duffle bag came into plain view as soon as Agent Frank Rodriguez opened it.  In this regard, the agent credibly testified that the papers were "right on top" of the clothing which constituted the other visible contents of the bag.  While it is true that the agent could not read such details as the name, title, or date on the birth certificate because the folding of the document initially concealed its text from view,  the agent credibly testified that, based on his training and experience, he immediately suspected that the document was a birth certificate based on physical qualities other than its text (such as its size and the type of paper it was printed on).

It is also important to note that, at the time the document first appeared in its folded form, the agent had not yet completed his search of the duffle bag for the controlled substances which were the initial object of his search.  Because controlled substances may appear in a minute form (such as a powder) that can be stored in a folded document, and a noticeable residue of such substances may be deposited on the surfaces of documents with which they come into contact, it would have been prudent for the agent to unfold the document in order to examine whether controlled substances or their residue had been deposited inside the fold.  In this regard, other courts have recognized that "cocaine is commonly distributed as a powder in small vials and envelopes and, thus, is easily concealable in confined areas, such as notebooks, hollowed-out books and human body

cavities.  [Thus, i]n their search for cocaine, the agents were authorized to search any and all areas and items where the narcotic might readily be concealed."  <u>Barnes</u>, 909 F.2d at 1069.

Because determining the reasonableness of the duffle-bag search does not depend on the agent's subjective intentions in this context, <u>see</u> <u>Whren</u>, 517 U.S. at 813, it does not matter whether he subjectively thought he was unfolding the document inside Defendant's duffle bag in order to confirm that it was a birth certificate or in order to determine whether controlled substances or their residue were concealed therein.  From an objective standpoint, the fact remains that unfolding the document (and thereby causing its text to appear in plain view) was within the permissible scope of a search for controlled substances.

By the time the agent unfolded the document (if not before), the incriminating nature of Defendant's possession of a birth certificate became immediately apparent. In this regard, the agent credibly testified that the presence of a birth certificate in Defendant's duffle bag raised a "red flag" because it was inconsistent with the border crossing card and I-94 form that Defendant previously displayed and that indicated he was a citizen of Mexico.  The agent further ruled out the possibility of an innocent explanation for the birth certificate because the age listed therein was similar to Defendant's age, not that of a child.  And once the obviously incriminating birth certificate came into the agent's plain view, the agent would have probable cause to read the other identification documents with which it was commingled in the duffle bag.

Accordingly, the Border Patrol agents' discovery of the birth certificate and other false identification documents inside Defendant's duffle bag did not violate the Fourth

Amendment, because the dog's alert provided probable cause to search the duffle bag for the controlled substances the dog is trained to detect, and during the course of that search the incriminating nature of the birth certificate came into plain view and became immediately apparent.  As these grounds alone are sufficient to prove that the warrantless search of the duffle bag and the birth certificate were reasonable under the Fourth Amendment, I find it unnecessary to address whether this search may be justified on alternative grounds, such as the agent's testimony that he asked for and received Defendant's consent to search the duffle bag.

### F.    Probable Cause to Arrest Defendant

Having lawfully discovered the birth certificate and other false identification documents in Defendant's duffle bag, the next question is whether this discovery established probable cause to arrest Defendant when viewed under the totality of the circumstances. According to the testimony of Agent Frank Rodriguez, his next step after discovering the birth certificate was to question Defendant about it.  Defendant did not provide the agent with an innocent explanation for why the birth certificate was in his duffle bag.

The inconsistency between the birth certificate and the immigration documents that Defendant had previously shown to the agents, which listed a different name, raised questions about Defendant's true identity and immigration status that logically warranted additional investigation by means of fingerprinting and a records check.  The fingerprinting and records check produced evidence that established probable cause to believe that Defendant had reentered the United States unlawfully.  Thus, to the extent that the probable

cause to arrest Defendant for a drug crime based on the dog alert had dissipated or become stale at the time the agents completed their search for controlled substances in the pickup truck and in the duffle bag, the Fourth Amendment nevertheless permitted the agents to continue detaining him based on probable cause to believe he was committing an immigration offense.

In the alternative, the Government's response brief also identifies a provision of the United States Code which makes it a crime to knowingly possess false identification documents with intent to use or transfer them unlawfully, or with intent to defraud the United States, or with intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law.  See 18 U.S.C. § 1028.  The elements of an offense under this statute may involve a degree of complexity which might be difficult for an officer in the field to analyze on short notice.  See United States v. Klopf, 423 F.3d 1228, 1236-39 (11th Cir. 2005).

A determination of probable cause, however, would not require proof that all the technical requirements of the statute were completely satisfied.  While the probable-cause standard requires more than a mere suspicion, see United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998), it "'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe '*an*

offense' had been committed."  Edwards, 242 F.3d at 935 (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).

Accordingly, I also conclude that the discovery of the birth certificate and other false identification documents, combined with the surrounding circumstances noted above, provided the agents with probable cause to arrest Defendant for a false identity offense under 18 U.S.C. § 1028, and to perform the fingerprinting and records check which led to the evidence that he had illegally reentered the United States as charged in the Indictment.  It follows that Defendant's motion to suppress must be denied, and there is no basis for invoking the exclusionary rule in this case.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court denies Defendant's motion to suppress as well as his motion for production of additional training and field records of the dog and his handler.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion to Suppress* [Doc. 26] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion for Production of Dog and Handler's Training and Field Records* [Doc. 16] is **DENIED**.

**SO ORDERED** this 25th day of June, 2007, in Las Cruces, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-35-